**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

TIMOTHY MARSH,

      Plaintiff,

v.

GERALD CURRAN, ESQ. et al.

      Defendants.

Civil Action No. 1:18-cv-00787-LO-IDD

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT LAWYERS' MOTION TO DISMISS/MOTION TO STRIKE**

COMES NOW Plaintiff, Timothy Marsh, by counsel, and respectfully submits this Opposition To Defendant Lawyers' (Defendants Gerald Curran, Demian J. McGarry and The Law Office of Curran, Moher, Weis, P.C.), Motion To Dismiss/Motion To Strike, and states as follows:

**SUMMARY OF ARGUMENT**

Notwithstanding that Plaintiff filed a First Amended Complaint ("FAC") that made substantive factual additions to five Paragraphs of his original complaint (¶¶ 20, 22, 31, 36, 71), added thirty-two Paragraphs of new factual allegations (¶¶ 73-105), and referenced and attached nine new Exhibits containing additional documentary support for his allegations (Exhibits N-V), the Defendant Lawyers simply re-filed the identical motion to dismiss that they filed in response to the original complaint. *Compare* Memorandum Of Law In Support Of Defendant Lawyers' Motion To Dismiss/Motion To Strike, filed July 26, 2018 (Document 12) *with* Memorandum Of Law In Support Of Defendant Lawyers' Motion To Dismiss/Motion To Strike, filed August 30, 2018 (Document 39). In doing so, the Defendant Lawyers made no attempt whatsoever to

1

modify their arguments to deal with the more than thirty-five additional factual allegations and related documentary evidence set forth in the FAC.

As a consequence, the Defendant Lawyers' Motion to Dismiss: (1) continues to fail to address the specific factual allegations that more than adequately show a plausible basis that the Defendant Lawyers may be held liable for their use and disclosure of information that they knew or should have known came from illegal recordings;[1] (2) continues to improperly approach their arguments as though we are here on a motion for summary judgment, instead of a Rule 12(b)(6) motion limited to testing whether Plaintiff has asserted sufficient factual allegations showing "plausible" claims for relief, and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses"; and (3) continues to fail to establish any grounds for this Court to dismiss or strike any claims, much less dismiss all the claims against the Defendant Lawyers, as requested in their Motion.[2]

---

[1]     The Wiretap Act imposes liability on any person who intentionally discloses and/or uses the contents of "any wire, oral, or electronic communication, ***knowing or having reason to know*** that the information was obtained through the interception of a wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(c)-(d) (emphasis added). As the Lawyer Defendants themselves acknowledge (Mem. 10-11), the statute contains a "knowing or should have known" basis to establish liability for use or disclosure of communications under 18 U.S.C. § 2511(1)(c)-(d), which requires only that plaintiffs show that the Defendant Lawyers "were aware of the factual circumstances that would violate the statute." *Lewton* v. *Divingnzzo*, 772 F.Supp.2d 1046, 1059 (D.Neb. 2011) (citing *Thompson* v. *Dulaney*, 970 F.2d 744, 749 (10th Cir. 1992). As we show, as alleged in the Complaint and demonstrated herein, the Defendant Lawyers were clearly "aware of the factual circumstances that would violate [the Wiretap Act]." *Id.*

[2]     Defendant Lawyers and their counsel also continue to include in their motion inflammatory assertions that Plaintiff had "various paramours" and committed "serial adultery" (Mem. 1, 2, 3, 7), which have no valid evidentiary basis in the underlying divorce proceeding and could only be based on information from the illegal recordings. The use of this illegally obtained information by the Defendant Lawyers and their counsel to gain a tactical advantage in this litigation by seeking to prejudice the Court against Plaintiff is an additional violation of the federal and state wiretapping statutes by the Defendant Lawyers, and by their counsel.

As we show below, the facts alleged in the FAC adequately plead that: (1) Plaintiff's wife, Andrea Marsh, and the Non-Lawyer Defendants (D and K Hampton) engaged in illegal interception of communications; and (2) Andrea Marsh, the Non-Lawyer Defendants, and the Defendant Lawyers engaged in the illegal use and disclosure of information from those illegally intercepted communications, in violation of the federal and Virginia wiretapping statutes, among other violations.

The Defendant Lawyers do not challenge the sufficiency of the pleadings that illegal wiretapping occurred based on the allegations that Andrea Marsh and the Non-Lawyer Defendants K and D Hampton illegally intercepted Plaintiff's communications by the placement of recording devices in Plaintiff's home, car and cell phone. FAC, ¶¶2, 18-21. Indeed, the Defendant Lawyers refer to the fact that in the underlying divorce case, in which they represented Andrea Marsh, the Honorable Thomas Horne of the Loudoun County Circuit Court ruled on March 30, 2018 that the recordings violated the wiretap statute. See Mem. 3; see FAC, ¶¶4, 33, and Exhibit B, Tr. 118:12-119:20; FAC, ¶¶26, 30-32, 34-38, 40-41, 47, 55.

Nor do the Defendant Lawyers challenge the sufficiency of the pleadings that they used and disclosed information from the wiretapped recordings in the divorce litigation. FAC, ¶¶44-45, 48-52. Rather, the Defendant Lawyers' principal basis to throw out the wiretapping claims at the pleading stage is their incredulous assertion that the FAC fails to allege facts sufficient to show, if proven, that the Defendant Lawyers knew or should have known that the recordings were illegal. See Mem. 10-11 (*e.g.,* at Mem. 11: "Plaintiff has failed to allege facts which, if proven, would show that the Defendant Lawyers were aware of the factual circumstances surrounding the recordings sufficient to make them aware that they were illegally obtained.").

As shown (at pp. 9-21, 28-29, *infra*), this argument is baseless.  The FAC is replete with allegations and accompanying documentary evidence that the Defendant Lawyers were on inquiry notice and knew or should have known that the information they were using in the litigation came from illegal recordings.

Specifically, the FAC alleges that the Defendant Lawyers' inquiry notice and knowledge that they were using information in the divorce proceeding that was obtained from illegal recordings is demonstrated by, among other things: (1) communications with their own client, Andrea Marsh (see pp. 14-15, *infra*); (2) communications with Andrea Marsh's family members, including co-defendants herein (see p. 14, *infra*); (3) discovery seeking admissions from Andrea Marsh relating to her involvement in "clandestinely" placing recording devices in Plaintiff's car and home office and "clandestinely" recording Plaintiff's phone calls with third parties without permission, and requesting documents, including "recordings or any other type of information gathered from any surveillance equipment" (see pp. 16-17, *infra*); (4) the discovery responses the Defendant Lawyers filed on behalf of their client, for example, identifying women with whom the Plaintiff purportedly engaged in specific sexual acts, knowledge of which could only have come from illegal recordings of private conversations (see p. 16, *infra*); (5) the deposition questions that the Defendant Lawyers propounded to a third-party deponent asking questions that could only have come from illegal recordings of the deponent's private conversations with the Plaintiff, such as whether the deponent had engaged in sex in Plaintiff's car after dinner at a restaurant and whether the Plaintiff "told you that he was afraid that the garage had cameras" (see pp. 17-18, *infra*); (6) the notice and warning the Defendant Lawyers received from counsel for Plaintiff about his concern that their client "has been electronically surveilling Tim" (see pp. 15-16, *infra*); and (7) the notice and warning the Defendant Lawyers received from counsel for

the third-party deponent that the information in their deposition questions to the deponent came from illegal recordings of the deponent in violation of wiretapping statutes (see p. 18, *infra*).

It is further alleged in the FAC that subsequently the Defendant Lawyers received incontrovertible actual knowledge that the recordings were illegal when Judge Horne ruled so after hearing evidence at the March 30, 2018 Hearing. See pp.10-12; 18-20; 18, *infra*. Yet, despite having undeniable actual knowledge based on Judge Horne's March 30 ruling that the recordings were illegal and violated the wiretap statute, the Defendant Lawyers continued to use information obtained from those illegal recordings in the divorce case. See pp. 18-21, *infra*.

None of the other arguments pressed by the Defendant Lawyers in their Motion provide any basis to dismiss any claims or strike any allegations. As we show below, the FAC contains ample factual allegations to demonstrate a plausible basis for the claim of intentional infliction of emotional distress under proper pleading requirements in federal court. See pp. 24-28, *infra*. Further, no private cause of action has been asserted based on violations of the Virginia Rules of Professional Conduct. Rather, the allegations concerning the professional rules violations are highly relevant and material to, among other things: (1) rebut the Defendant Lawyers' contention that they have a "privilege" to violate the wiretap statutes; (2) rebut the Defendant Lawyers' contention that they had no reason to know that the information they were using in the litigation was obtained in violation of the wiretap statutes; (3) demonstrate that the Defendant Lawyers had "inquiry notice" that the information they were using in the litigation was obtained in violation of the wiretap statutes; and (4) provide the steps the Defendant Lawyers were obligated to take that would have established their actual knowledge that the information they were using in the litigation was obtained illegally in violation of the wiretap statutes. See pp. 23-24, *infra*. Nor does the Defendant Lawyers' tactical argument to blame the person who was the victim of the

illegal recordings provide any basis to dismiss any claims.  This argument does not excuse the Defendant Lawyers' illegal conduct or shield them from liability and responsibility for damages for their illegal actions.  See pp. 21-23, *infra*.

Having failed to set forth a single valid basis to dismiss any claims or strike any allegations in the FAC, the Defendant Lawyers' Motion to Dismiss/Motion to Strike should be denied in its entirety.

## STANDARD OF REVIEW

A motion to dismiss for failure to state a claim upon which relief can be granted challenges the legal sufficiency of a claim, rather than the facts supporting it.  Fed.R.Civ.P. 12(b).  Courts will favorably construe the allegations of the complaint and assume that the facts alleged in the complaint, and any provable facts consistent with the allegations, are true.  *See Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed2d 59 (1984); *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).  Courts must view the facts alleged in the complaint in light most favorable to the plaintiff.  *Christopher v. Harbury*, 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002).

A complaint need not contain "detailed factual allegations" in order to survive a motion to dismiss, but the complaint must incorporate "enough facts to state a belief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Giarranto v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  This plausibility standard does not equate to a probability requirement, but it entails more than a mere possibility that a defendant has acted unlawfully.  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1973, 173 L.Ed.2d 868 (2009).

The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955, 167L.Ed.2d 929.

Significantly, a Rule 12(b)(6) motion tests the sufficiency of the pleading.  It does not resolve factual disputes, "the merits of a claim, or the applicability of defenses." *Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992); see also *e.g.*, *SD3, LLC v. Black & Decker (U.S.), Inc.*, 801 F.3d 412, 441 (4th Cir. 2015) (motion to dismiss under Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses").  While *Twombly* held that a complaint must include enough facts for a claim to be "plausible on its face" and thereby "raise a right to relief about the speculative level," district courts are required to assume that all well-pled factual allegations "are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations omitted).  District courts must also "draw all reasonable inferences in favor of the plaintiff," taking care to avoid any invitation to resolve factual disputes at the pleading stage. *Kensington Volunteer Fire Dep't v. Montgomery County*, 684 F.3d 462, 467 (4th Cir. 2012) (internal quotation marks and citations omitted).

As we show below, the FAC and its attached Exhibits more than amply set forth "enough facts to state a belief that is plausible on its face" that: (1) the Defendant Lawyers knew or should have known that they were violating the wiretap statutes by using information gained from illegal recordings in the divorce proceeding; and (2) their illegal conduct "went beyond all possible bounds of decency" when the Defendant Lawyers (a) knowingly and intentionally continued to use the illegally obtained information after repeated warnings by counsel that their conduct was illegal, and (b) in further disregard for the law and their ethical obligations they

knowingly and intentionally continued to use the illegally obtained information after Judge Horne ruled that the recordings violated the wiretap statute.

## ARGUMENT AND AUTHORITIES

1.     **The Defendant Lawyers Have No "Absolute Privilege" To Use Illegally Obtained Information in Violation of Wiretap Statutes.**  The Defendant Lawyers assert that "their alleged 'use' of [information from illegal recordings] under the facts plead is absolutely privileged under the law."  Mem. 2; see also Mem. 5.  For their "absolute privilege" argument, the Defendant Lawyers rely on: (1) a 20-year old Indiana state court decision, which they assert "held that an attorney's use of illegally taped recordings in a judicial proceeding was privileged" (citing *Hamed* v. *Pfeifer*, 647 N.E.2d 669 (Ind. Ct. of App. 1995)); and (2) the Fourth Circuit decision in *Culbertson* v. *Culbertson,* 143 F.3d 825 (4th Cir. 1998).

a.     **Fourth Circuit Decision in *Culbertson.***  It is clear that the Fourth Circuit decision in *Culbertson* does not establish an absolute privilege for attorneys to use information obtained from illegal wiretap recordings.  The Defendant Lawyers concede this, acknowledging that the Fourth Circuit in *Culbertson* did not "exonerat[e] the attorney defendant on grounds of privilege."  See Mem. 6.  Thus, as we show below, the *Culbertson* decision provides no basis for this Court to dismiss the wiretapping claims against the Defendant Lawyers on a Rule 12(b)(6) motion as "implausible" on their face.

What *Culbertson* does demonstrate is that whether an attorney may avoid liability for using information from illegally recorded communications is a highly fact-intensive inquiry. Specifically, the Fourth Circuit reviewed the factual circumstances surrounding the use of the illegally obtained information by the attorney for impeachment purposes, together with the attorney's reliance on a South Carolina state court decision describing the intent of the wiretap

statute, and determined that on the specific facts and circumstances revealed in the summary judgment record, the attorney who used the illegally obtained information for impeachment purposes should not have been ordered to pay any part of the plaintiff's attorney's fees.  143 F.3d at 828.  In *Culbertson*, what the court of appeals found significant were the facts that: (1) the illegally obtained evidence was used to impeach a witness's evidence presented to the trial court in an affidavit, which was evidence "presented for the truth of the matter asserted" and thus was validly subject to impeachment by other evidence; and (2) the attorney who had submitted the illegally obtained information for impeachment purposes did so in reliance on a state law decision that was controlling in the family court proceeding at the time that held that the wiretap statute "was not intended to prevent the use of illegally obtained recordings of telephone conversations for impeachment purposes."  143 F.3d at 828.

The allegations in the FAC demonstrate that the exact opposite factual circumstances are presented here.  First, the Defendant Lawyers sought to use the illegally obtained information not for the limited purpose to impeach evidence presented for the truth of the matter asserted, but affirmatively to, among other things: (1) gain tactical and financial advantage in the litigation (¶¶3, 39, 51, 94-95); (2) respond to discovery (see p. 16, *infra*); and (3) depose a third-party witness and use private and personal details from the illegal recordings of her private communications with Plaintiff to embarrass and humiliate the deponent and Plaintiff (see pp. 17-18, *infra*).  Second, rather than having a credible basis to believe they were acting lawfully, the Defendant Lawyers were repeatedly warned that using the illegally obtained information would subject them to liability under the wiretap statutes (FAC, ¶¶56-59, and Exhibits L and M; FAC, ¶46, and Exhibit H), yet they persisted in using illegally obtained information even after they became aware of the illegality based on their client's assertions of the Fifth Amendment to avoid

responding to discovery about her involvement in "clandestine" recordings (see pp. 16-17, *infra*), and even after Judge Horne ruled that the recordings violated the wiretap statute (see pp. 11-12; 18-20, *infra*).

The *Culbertson* decision, therefore, provides no basis for this Court to dismiss the wiretapping claims against the Defendant Lawyers on a Rule 12(b)(6) motion as "implausible" on their face. What the Defendant Lawyers appear to lose sight of is that we are here on a Rule 12(b)(6) motion to dismiss for failure to state a claim: the purpose of which is solely to test the sufficiency of the pleadings to determine whether Plaintiff has set forth enough facts to state a claim "that is plausible on its face" so as to entitle Plaintiff to proceed with discovery to support that claim. Given this limited purpose, the Defendant Lawyers are asking this Court to do what it cannot do on a Rule 12(b)(6) motion: "resolve factual disputes" or the "merits of a claim" or the "applicability of defenses." See, *e.g. Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (A Rule 12(b)(6) motion tests the sufficiency of the pleading. It does not resolve factual disputes, "the merits of a claim, or the applicability of defenses."). Notably, *Martin* was cited and relied on by the Defendant Lawyers (Mem 5) in their statement of the applicable "Standard of Review." See also, *e.g.*, *SD3, LLC v. Black & Decker (U.S.), Inc.*, 801 F.3d 412, 441 (4th Cir. 2015) (motion to dismiss under Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses") (internal citations and quotation marks omitted).

   **b.    20-year old Indiana State Court Decision in *Hamed*.** The other case relied on by the Defendant Lawyers (*Hamed* v. *Pfeifer*, 647 N.E.2d 669 (Ind. Ct. of App. 1995)), is a 20-year-old Indiana state court decision that is not binding on this Court. Moreover, it is easily distinguished. To begin with, *Hamed* was decided on summary judgment, not on a Rule 12(b)(6)

or equivalent motion to dismiss for failure to state a claim.  Further, the court in *Hamed* held that: (1) the attorney for the insurer who used the recording in an insurance fraud dispute had no reason to know that the recording was obtained in violation of the federal Wiretap Act, and (2) the federal court that heard the original insurance fraud dispute from which *Hamed* arose explicitly held that the recording could be admitted into evidence (*Hamed*, 647 N.E.2d at 671).

By contrast here, the Defendant Lawyers had every reason to know that the recordings were illegally obtained in violation of the wiretap statutes prior to Judge Horne's ruling (see pp. 14-18, *infra*), and had indisputable knowledge that the recordings were illegally obtained after Judge Horne ruled that the recordings "were obtained in violation of the statute" (FAC, Exhibit B, Tr. 118; see also Tr. 119-120).  Further, the Defendant Lawyers had every reason to know and did know from Judge Horne's ruling that their continued use of information gained through the illegally obtained recordings would subject them to liability under the state and federal wiretap statutes.  Indeed, Judge Horne specifically discussed the problem of the "Fruit of the poisonous tree" arising from derivative use of information gained from the illegal recordings.  FAC, Exhibit B, Tr. 119-120.  Judge Horne then explicitly stated that because the recordings "were made in violation of the statute," "those written interrogatories are going to have to be specific in terms of avoiding any possibility that there would be a taint from the exploitation of the information gained through the recordings."  FAC, Exhibit B, Tr. 119-120.

Finally, to the extent that the Defendant Lawyers rely on the statement in *Hamed* that "the common law provides absolute immunity for all persons who are integral parts of the judicial process" (*Hamed* 647 N.E.2d at 672), this is *dicta*.  Moreover it is *dicta* based on an

erroneous reading and then unsupported extension of the *Rose* and *Briscoe* cases cited in the decision.[3]

The unreliability of the *dicta* in *Hamed* is further made clear by a multitude of federal court cases explicitly holding that attorneys who violate the Wiretap Act are not entitled to invoke common-law "immunity" and "litigation privilege" defenses.   See, *e.g.*, *Lewton v. Divingnzoo*, 772 F.Supp.2d 1046, 1057 (D.Neb. 2011) (finding "no binding authority holding that an attorney who uses a communication intercepted in violation of the federal Wiretap Act is entitled to blanket immunity from [Wiretap Act] liability" but instead finding "persuasive authority to the contrary") (citing *Babb v. Eagleton*, 616 F.Supp.2d 1195, 1207 (N.D.Okla. 2007) (holding that actions of ex-wife's attorney in using ex-wife's recordings obtained in violation of the Wiretap Act in a motion to modify custody plan did not qualify for any "litigation privilege"); *Nix v. O'Malley*, 160 F.3d 343, 352-53 (6th Cir. 1998) (declining law firm's "invitation to immunize attorneys for certain violations of the [federal Wiretap Act] and Ohio

---

[3]     *Hamed* misinterprets federal court cases (one of which did not even address the Wiretap Act).  See *Hamed*, 647 N.E.2d at 672 (citing *Briscoe v. La Hue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (holding that 42 U.S.C. § 1983 does not authorize a damages action against private witnesses, judges or prosecutors for the performance of their respective duties in a judicial proceeding) and *Jacobson v. Rose*, 592 F.2d 515 (9th Cir. 1978), *cert. denied* 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1978) (holding that when district attorney participated in implementing the illegal wiretapping, the district attorney did not enjoy quasi judicial immunity against damage suit for illegal wiretap).  At issue in *Briscoe* and *Rose* were actions of a quasi-judicial nature as an extension of the judiciary, which is not at all relevant to the case at hand involving actions by attorneys for a plaintiff in a divorce case using information from illegal wiretaps to gain tactical litigation advantage.  See *Briscoe*, 460 U.S. at 328 (holding that "all witnesses--police officers as well as lay witnesses--are absolutely immune from civil liability based on their testimony in judicial proceedings" because a witness's apprehension of subsequent damages liability might make the witness be reluctant to come forward to testify and, once the witness is on the stand, his testimony might be distorted by the fear of subsequent liability); *Rose*, 592 F.2d at 524 (upholding District Court's ruling that district attorney and his deputy did not enjoy the quasi-judicial immunity against suit afforded prosecutors performing quasi-judicial functions because they acted in an administrative, not judicial, manner).

wiretap law" and noting that "this proposed immunity contravenes the plain language of federal and state wiretap statutes"); *U.S. v. Wuliger*, 981 F.2d 1497, 1505 (6th Cir. 1992) ("There is nothing in the [Wiretap] Act which affords attorneys special treatment.")).

**c.** **The Allegations In The FAC Demonstrate The Absence Of Any Factual Basis For Any "Privilege" Defense.**  The Defendant Lawyers' attempt to veil their illegal actions in the halo of "the truth-seeking process" -- and the purported need to protect that process with a "privilege" that will eliminate attorney "fear" of "misjudging" the legality of using particular information -- is completely unavailing. See Mem. 5-6  (citing and quoting *Scheib* v. *Grant*, 22 F.3d 149, 156 (7th Cir. 1994) ("the truth-seeking process 'will be most securely advanced if attorneys do not fear civil or criminal liability as the consequence of misjudging the legality of disclosing particular information.")).   The Defendant Lawyers assert that the "same policy concerns underlying the *Scheib* court's comments are present in this matter." Mem. 6. Nothing could be farther from the truth.

**i.** **The Defendant Lawyers Had "Inquiry Notice" And At The Very Least "Should Have Known" That The Information They Were Using and Disclosing Was Obtained From Illegal Recordings.** The facts alleged in the FAC demonstrate that the Defendant Lawyers had "inquiry notice" and ample opportunity to determine the illegality of the recordings of Plaintiff's private communications from their own client, Andrea Marsh, and her sister, Defendant K Hampton, who was directly communicating with the Defendant Lawyers. FAC, ¶¶23, 28, and Exhibit C.  *See, e.g., SD3, LLC v. Black & Decker (U.S.), Inc.*, 215 F.Supp.3d 486, 494 (E.D.Va. 2016), *aff'd sub nom* 888 F.3d 98 (4th Cir. 2018) ("Inquiry notice . . . charges a person to investigate when the information at hand would have prompted a

reasonable person to do so.") (quoting *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170 (4th Cir. 2007)).

Specifically, the FAC alleges that the Defendant Lawyers received an email from Andrea Marsh on April 6, 2017 addressed to "Gerry" with the RE: "Our conversation this morning." FAC, ¶24, and Exhibit A.  In the April 6 email, their client sets forth details of obviously private conversations between Plaintiff ("Tim") and others ("Monika" and "mom"), including attorney-client privileged communications with Plaintiff and his attorney ("Brian" West), that could only have come from illegal recordings. FAC, ¶24, and Exhibit A ("Tim was talking to Monika * * *. She is helping Tim put stuff together for Brian.  He told her he is taking his Rosy phone into work so he can talk to her. * * *  Said Brian is sending him articles about stock options * * * . Brian bought Tim's Panerai watch for $7500 to put as credit toward his legal fees. * * * Said he needs receipts of everything I buy. Talked to his mom. She is coming down this weekend to help with Liam. * * * ").

The FAC further alleges (at ¶25) that the "details of Plaintiff's telephone and other communications provided in the April 6, 2017 email . . . "far exceed any openly available information and could only have been obtained through the illegal interceptions of Plaintiff's telephone and other communications."  This allegation is further buttressed by the additional allegations (FAC, ¶¶82, 83) that the Defendant Lawyers "knew that the Private Investigator was not the source of many of the details and substance of Plaintiff's private communications with others" and "[n]one of the information" relayed to the Defendant Lawyers in their client's April 6, 2107 email came from the report of the Private Investigator.

This April 6 email contained multiple "red-flags" to prompt the Defendant Lawyers to inquire of their client:  how do you know the details of conversations between your estranged

husband "Tim" and other persons, including what was "said" and "told" to "Monika" and his "mom," and details of what Tim discussed with his attorney, "Brian" West.  *See SD3, LLC*, 215 F.Supp.3d at 494; *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170.

What is more, just one week after the Defendant Lawyers received the April 6 email from their client -- which by itself provided adequate factual circumstances of illegal activity that the Defendant Lawyers "should have known" the information came from illegal recordings -- the Defendant Lawyers received an email on April 13, 2017 from Plaintiff's counsel in the divorce proceeding, Brian West, further solidifying their "should have known" basis for knowledge of the illegality of wiretapped recordings.  FAC, ¶57.  In the April 13 email, Brian West stated his concern that: "it appears that your client has been electronically surveilling Tim.  Please ask your client to not destroy or delete any of the results of her surveillance."  FAC, ¶57, and Exhibit L. What could be more clear to the Defendant Lawyers that illegal wiretapping -- "electronic surveillance" and possession of details from private conversations that could have only come from illegal recordings -- was underfoot?[4]

Just two weeks later, on April 27, 2017, the Defendant Lawyers submitted discovery responses on behalf of their client, Andrea Marsh, identifying women with whom Plaintiff purportedly engaged in a very specific sex act.  FAC, ¶¶84-85, and Exhibit Q.  As alleged in the FAC (¶¶82, 84-87)), this information was of such a specific nature that it further served as a basis to put the Defendant Lawyers on inquiry notice of illegal recordings as the explanation for their client having such detailed, specific knowledge.

---

[4]    See also FAC, ¶¶34-39, and Exhibits E and F ("Andrea Marsh Journal of Tim's Activities"), which formed the basis for the deposition questions to Monika Pawar (FAC, ¶¶44-51, 88-93, and Exhibits G and I), further reflecting the fact that Plaintiff's telephone and other communications were illegally intercepted.).

Further putting the Defendant Lawyers on inquiry notice, on April 28, 2017, the Defendant Lawyers were served with discovery requesting: (1) that their client produce documents relating to "recordings or any other type of information gathered from any surveillance equipment you, or another person at your direction, placed" in her husband's vehicle or the marital home or her husband's cellphone, and any "key logger" their client or others at her direction installed on her husband's computer (FAC, ¶¶54-55, Exhibit K); and (2) that their client admit her involvement in "clandestinely recording" phone calls of her husband's conversations with third-parties without permission, "clandestinely" placing recording devices in her husband's car, his home office and their kitchen, and "clandestinely placing a tracking device" on her husband's car (FAC, ¶¶53,55, Exhibit J).

As alleged in the FAC, these and other discovery requests/responses and other case filings and communications to/from the Defendant Lawyers: (1) put them on inquiry notice, such that they knew or should have known of their client's involvement in making illegal recordings (FAC, ¶¶77, 80, 85, 89, 96-105); (2) did cause the Defendant Lawyers to make inquiries of their client (FAC, ¶¶84, 86, 91); and (3) did result in the Defendant Lawyers having actual knowledge of their client's involvement in illegal recordings (FAC, ¶¶84, 86, 91, 104-105).

The Defendant Lawyers' actual knowledge of their client's involvement in illegal recordings is further alleged to be established by their client's Fifth Amendment assertions on May 19, 2017 as the basis for not making admissions about her involvement in "clandestine" recordings and not producing the recordings or responding to discovery requests concerning them (FAC, ¶¶32, 37, 41, 47, 53-55, and Exhibits J and K), and their client's later assertion of the "work-product doctrine" to avoid producing the illegal recordings (FAC, ¶60, and Exhibit K).

**ii.     The Defendant Lawyers Used and Disclosed Information Obtained From Illegal Recordings When They "Should Have Known" of the Illegality.**  Despite the "inquiry notice" and actual knowledge of illegal recordings of Plaintiff's private conversations with third parties, the Defendant Lawyers used information from the illegal recordings to gain tactical advantage in the litigation (FAC, ¶¶3, 39, 51, 94-95), to respond to discovery (see p. 16, *infra*), and to take the deposition of a third-party, Ms. Pawar, whose private communications with Plaintiff was surreptitiously and illegally recorded and then strategically used in her deposition to needlessly cause embarrassment and humiliation (FAC, ¶¶44-45; 88-91, and Exhibits G and R).

 For example, among other details that could have only come from illegally recorded private conversations, the questions submitted for the deposition of Ms. Pawar included needlessly repeated references to "oral sex" and whether Ms. Pawar engaged in "oral sex" "in [Timothy Marsh's] Land Rover automobile" and in Timothy Marsh's "automobile in a parking garage" and "He told you that he was afraid that the garage had cameras" and "You were wearing a sweater dress with a zipper up the side."  FAC, ¶¶44-45, 88-91, and Exhibits G and R. Significantly, specific details of many deposition questions track the specific details of Plaintiff's intercepted communications that are reflected in the "Andrea Marsh Journal of Tim's Activities" (see FAC, ¶¶34-39, and Exhibit E), which meta-data reflects was created by Defendant Danielle Richards (FAC, ¶38, and Exhibit F).

Moreover, on March 16, 2018, prior to Judge Horne's ruling that the recordings violated the wiretap statute, the Defendant Lawyers received a letter from counsel for Ms. Pawar, notifying them: "We have learned that your client in conjunction with her sister and brother-in-law have [en]gaged in activity that violates the Virginia Wire Tapping Statute which gives rise to a civil cause of action in this case."  FAC, ¶46, and Exhibit H.  In the March 16 Letter, Ms.

Pawar's counsel further made a demand that all evidence of the illegal activity be preserved, including "any efforts to make use of this inappropriately obtained data in any civil proceeding." *Ibid*. Also on March 16, 2018, Plaintiff's counsel, Brian West, re-sent to the Defendant Lawyers his April 13, 2017 email from a year earlier stating: "Also I am concerned as it appears your client has been electronically surveilling Tim.  Please ask your client to not destroy or delete any of the results of her surveillance." FAC, ¶¶56-58, and Exhibit M.

>     **iii.     The Defendant Lawyers Used and Disclosed Information Obtained From Illegal Recordings When They Had "Actual Knowledge" of the Illegality.**  After Judge Horne's March 30 ruling that the recordings violated the wiretap statute, it is undeniable that the Defendant Lawyers then had actual knowledge that their use of information from the recordings violated the wiretap statute. FAC, ¶33; see also FAC, ¶¶26, 30-32, 34-38, 40-41, 47, 55, 93). Yet, despite all their inquiry notice establishing they should have known the recordings were illegal, and their subsequent actual knowledge of the illegality of the recorded conversations as early as May 19, 2017 based on their client's assertion of the Fifth Amendment in response to discovery,[5] the Defendant Lawyers chose to use information from the illegal recordings in the June 2017 deposition of Ms. Pawar.  Moreover, they did so in a way that was intentionally but needlessly embarrassing and humiliating. See pp. 17-18, *supra*.

Subsequent to Judge Horne's ruling on March 30, 2018 that the recordings violated the wiretap statute, the Defendant Lawyers continued to intentionally but needlessly use information

---

[5]     It is inconceivable that the Defendant Lawyers did not have actual knowledge of the illegal recordings by no later than May 19, 2017, when they submitted discovery responses on behalf of their client asserting the Fifth Amendment privilege for her refusal to admit her involvement in "clandestinely" placing recording devices in Plaintiff's car and home, and "clandestinely" making recordings of Plaintiff's private conversations, and her refusal to produce the recordings and any information from them obtained through the use of surveillance equipment.

from the illegal recordings in written interrogatories propounded to Ms. Pawar on June 1, 2018. FAC, ¶50, and Exhibit I. They did so: (1) after their client had repeatedly asserted the Fifth Amendment privilege in response to questions concerning her role in the illegally recorded communications during the March 30 Hearing (FAC, ¶¶26, 30-32, 34-38, 40-41, 47, 55); and (2) after their client supplemented her May 19, 2017 assertions of the Fifth Amendment with the "work-product doctrine" to refuse to produce "any recordings or any other type of information gathered from any surveillance equipment or application" (FAC, ¶60, and Exhibit K).

Having received from their client information gained from illegal recordings of Plaintiff's private conversations, and then having knowledge of the illegality of those recordings, including receiving notice and warning that their client was involved in improper electronic surveillance of Plaintiff, the Defendant Lawyers cannot cloak their decision to knowingly use this illegally obtained information to gain tactical advantage in the litigation as "privileged" or "absolutely immunized." The Defendant Lawyers never had any "uncertainty" that they might be "misjudging" the legality of their actions.  With full knowledge of the illegality of their actions and their legal jeopardy, the Defendant Lawyers chose to break the law and use the illegally obtained information in the divorce litigation.  And they continued to do so even after Judge Horne's ruling that the recordings were obtained in violation of the wiretap statute.

Finally, the Defendant Lawyers cannot credibly argue that they are entitled to "absolute immunity" for using illegally obtained information to gain tactical and financial advantages for their client in the divorce proceeding because "if they are compelled to defend themselves in this action, they will be unable to do so without disclosing their client's confidences and secrets in clear violation of her attorney/client privilege." Mem 6.  The Defendant Lawyers cannot have it both ways.  Upon discovery of the existence of illegal recordings and the illegally obtained

information gained from them, they had two clear choices.  They could comply with their ethical and legal obligations and *not use* the illegally obtained information, and thereby avoid legal jeopardy for themselves and safeguard the attorney-client privilege for their client.  Or they could *use* the illegally obtained information at their peril, and at the peril of their client, to gain strategic and financial advantages for their client in the divorce proceeding and place their client's attorney-client privilege at risk.

They made the latter choice.  In doing so, they knowingly gave away the attorney-client privilege, and cannot now be heard to complain about its loss.  They cannot escape the penalties of their clearly illegal and unethical choice.  This is the fundamental principle underlying the crime-fraud exception to the attorney-client privilege.  *See, e.g., In re Grand Jury Subpoena*, 884 F.2d 124, 127 (4th Cir. 1989) (citing  *Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933); *In re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4th Cir. 1984)) ("The crime-fraud exception to the attorney-client privilege provides that a client's communications with an attorney will not be privileged if made for the purpose of committing or furthering a crime or fraud."); In re Grand Jury Subpoena, 884 F.2d 124, 127 (4th Cir.1989) (The attorney-client privileges are lost when a client gives information to the attorneys for the purpose of committing or furthering a crime or fraud.)

In sum, should the Defendant Lawyers wish to press their purported "privilege" or "immunity" defense they may do so at trial, but it provides no basis for dismissal of the wiretapping claims against them at the pleading stage based on their own statement (Mem. 5) of the appropriate 12(b)(6) standard of review: *Martin*, 980 F.2d at 952 (Rule 12(b)(6) motion does not resolve factual disputes, "the merits of a claim, or the applicability of defenses").  See also, *e.g.*, *SD3, LLC v. Black & Decker (U.S.), Inc.*, 801 F.3d 412, 441 (4th Cir. 2015) (motion to

dismiss under Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses")   (internal citations and quotation marks omitted); *Kensington Volunteer Fire Dep't v. Montgomery County*, 684 F.3d 462, 467 (4th Cir. 2012) (district courts must also "draw all reasonable inferences in favor of the plaintiff," taking care to avoid any invitation to resolve factual disputes at the pleading stage).

**2.      The Law Permits Recovery And Does Not Shield From Sanction And Punishment The Defendant Lawyers' Illegal Actions Or The Damages Arising Therefrom.** The Defendant Lawyers argue that Plaintiff cannot recover damages that arise out of his own purported illegal and immoral conduct, citing a number of state and federal cases discussing the unclean hands doctrine.   Mem. 7.   Defendant Lawyers fail to cite any authority for the proposition that the unclean hands doctrine is applicable in cases alleging violations of the Federal Wiretap Act, 18 U.S.C. §§ 2510 *et seq* ("the Wiretap Act").   This lack of citation is telling because no such authority exists.

In fact, it is well-settled that the Wiretap Act "prohibits ***all wiretapping activities*** unless ***specifically excepted***."   *Pritchard v. Pritchard*, 732 F.2d 372, 374 (4th Cir. 1984) (emphasis added); *see also United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("[W]here . . .  the statute's language is plain, the sole function of the courts is to enforce it according to its terms.") (internal quotation marks omitted); *U.S. v. Wuliger*, 981 F.2d 1497, 1507 (6th Cir. 1992) (courts will not look beyond the language of [the Wiretap Act] which clearly expresses a blanket prohibition on all electronic surveillance, except under circumstances specifically enumerated in the statute); *Fultz v. Gilliam*, 942 F.2d 396, 402 (6th Cir. 1991) (because Wiretap Act sets out when certain uses or disclosures of wiretap material are authorized, it may be implied that "what is not permitted is forbidden"); *Kempf v.*

*Kempf*, 868 F.2d 970, 973 (8th Cir. 1989) (Wiretap Act prohibits all wiretapping unless specifically excepted; it is for Congress, not the courts, to alter the provisions of the statue); *U.S. v. Vest*, 813 F.2d 477, 482 (1st Cir. 1987) ("[I]f Congress had intended to commit to the courts general authority to create exceptions . . . Congress could certainly have said so more clearly.")

The Wiretap Act contains a number of specifically enumerated exceptions. But the right to illegally record a person and to use illegally obtained recordings because of purported illegal and/or purported immoral conduct of the person being recorded is simply not one of them. 18 U.S.C. § 2511; *Lewton v. Divingnzoo*, 772 F.Supp.2d 1046, 1056 (D. Neb. 2011) (applying *Pritchard* and *Kempf* and holding that mother and mother's attorney violated the Wiretap Act by recording father's interactions with child and using recordings in custody dispute case, even though mother maintained father was physically and verbally abusive of the child).[6]

Because the Wiretap Act does not specifically except the right to record a person and to use illegally obtained recordings because of purported illegal and/or immoral conduct of the person being recorded, the Defendant Lawyers' argument that Plaintiff cannot recover damages that arise out of his own purported illegal and immoral conduct must be rejected.

**3.     The Defendant Lawyers' Violations of the Virginia Rules of Professional Conduct Are Relevant and Material to Demonstrate The Absence of Any "Privilege" To Use Information Illegally Obtained in Violation of Federal and State Wiretapping Laws.**

---

[6]     The Fourth Circuit has recognized a very limited "impeachment" exception allowing the use of illegally intercepted communications to be introduced into evidence in court proceedings solely to impeach a witness's evidence presented for the truth of the matter asserted. *See, e.g., United States v. Crabtree*, 565 F.3d 887, 891–92 (4th Cir. 2009). This very limited exception, however, does not open the door to claim other wide-spread exceptions. *Id.* (rejecting a "clean hands" exception and noting that "[c]ourts have long distinguished impeachment evidence from substantive evidence, and material inadmissible as substantive evidence is often admissible for the limited purpose of impeaching a witness's testimony. … [W]e therefore do not believe that the logic underlying the impeachment exception compels us to recognize the clean-hands exception.").

The Defendant Lawyers argue that there is no private cause of action for violation of the Virginia Rules of Professional Conduct. Mem.   8. We do not disagree.   But Plaintiff has not asserted a private cause of action for violation of the Virginia professional conduct rules. See FAC,  ¶¶107-167.   Thus, there is no "cause of action" asserted for violation of professional conduct rules to "dismiss" or "strike."

However, to the extent that the Defendant Lawyers rely on a purported attorney "privilege" or "immunity" to use and disclose illegally obtained information in judicial proceedings, the Virginia Rules of Professional Conduct are relevant and material to establish that on the facts of this case no such "privilege" or "immunity" exists.   The rules of professional conduct are also relevant and material to the facts and issues raised by the Defendant Lawyers' contention that they had no reason to know that the information they were using in the litigation was obtained in violation of the wiretap statutes.   For example, to: (1) demonstrate that the Defendant Lawyers had "inquiry notice" that the information they were using in the litigation was obtained in violation of the wiretap statutes; (2) illuminate the steps that the Defendant Lawyers were ethically obligated to take that would have established their actual knowledge that the information they were using in the litigation was obtained illegally in violation of the wiretap statute; and (3) illuminate the options that the Defendant Lawyers had to proceed ethically and lawfully in the face of this knowledge.

Accordingly, the Defendant Lawyers' request to strike the allegations concerning professional conduct rules and violations (Mem. 8) should be denied.

**4.     The FAC States a Valid Claim For Intentional Infliction Of Emotional Distress Based on Federal Court Pleading Standards That Require Only "Relatively Simple Allegations of Emotional Distress" That Give Defendants "Fair Notice" of the Claim.**  The Defendant Lawyers concede that Plaintiff has properly pled the elements of a claim for intentional infliction of emotional distress.  Mem. 9 (quoting *Hatfill v. New York Times Co.*, 416 F.3d 320, 336 (4th Cir. 2005), *cert den'd*, 547 U.S. 1040, 126 S.Ct. 1619, 164 L.Ed.2d 333 (2006) ("A plaintiff seeking to recover for intentional infliction of emotional distress under Virginia law must allege that (1) the defendant's conduct was intentional and reckless; (2) the conduct was outrageous and intolerable; (3) the conduct caused the plaintiff's emotional distress; and (4) the plaintiff's distress was severe.").

The Defendant Lawyers argue, instead, that Plaintiff "has failed to allege facts which, if true, meet ***the very high bar*** for stating [a claim for intentional infliction of emotional distress]." Mem. 9 (emphasis added).  However, the Defendant Lawyers' argument that Plaintiff must meet a "very high bar" for pleading a claim for intentional infliction of emotional distress beyond what has been pled is not supported by Fourth Circuit precedent.  To the contrary, the Fourth Circuit has held that, in federal court, plaintiffs do not have to plead emotional distress with the particularity required in Virginia courts.  *Hatfill*, 416 F.3d at 337.

Specifically, the Fourth Circuit has explicitly held that Fed. R. Civ. P. 8 "trumps Virginia's heightened pleading standards for intentional infliction of emotional distress in federal cases governed by state law." *Id.*  As a consequence, in federal court plaintiffs do not have to plead emotional distress with the particularity required in Virginia Courts.  *Id.* ("[Plaintiff] did not allege his emotional distress in such specific terms, but Rule 8—applicable in this diversity case—did not require him to do so.").  Instead, plaintiffs need only to give defendants "fair

notice of . . . the claim . . . and the ground upon which it rests." *Id.  See also Daniczek v. Spencer*, 156 F.Supp.3d 739, 758 (E.D. Va. 2016) ("[T]he Fourth Circuit requires federal courts applying Virginia law to apply laxer standards of pleading than Virginia requires in its own state courts.").  "Relatively simple allegations of emotional distress are sufficient to meet this requirement." *Williams v. Agency, Inc.*, 997 F.Supp.2d 409, 415 (E.D. Va. 2014) (citing *Hatfill*, 416 F.3d at 337).[7]

The FAC allegations, as shown below, contain sufficient facts to meet the more lenient federal pleading requirements to give Defendant Lawyers "fair notice of . . . the claim . . . and the ground upon which it rests." *Hatfill*, 416 F.3d at 337.

Plaintiff has alleged that the Defendant Lawyers "used  . . . the illegally intercepted recordings [to gain] a tactical advantage in the divorce case [and gain] leverage in seeking financial advantage in the divorce case." FAC, ¶¶3, 39, 51, 94-95.  Thus, just like the plaintiffs in *Hatfill* and *Daniczek*, Plaintiff here has alleged that, as a result of Defendant Lawyers' actions, Plaintiff has suffered "past and ongoing financial injury."

---

[7]        In *Hatfill,* the Fourth Circuit concluded that allegations that plaintiff "has suffered severe and ongoing loss of reputation and professional standing, loss of employment, past and ongoing financial injury, severe emotional distress and other injury" were sufficient to state a claim for intentional infliction of emotional distress.  416 F.3d at 337; *see also Daniczek*, 165 F. Supp. 3d at 758-59 (allegations of "severe and ongoing loss of reputation and professional standing, . . . past and ongoing financial injury, severe emotional distress . . . and grievous emotional distress" were "sufficient under Rule 8 to give [defendant] fair notice of what [plaintiff's] claim is and the grounds upon which it rests . . .  [and thus met] the Fourth Circuit's pleading requirements." (internal quotation marks omitted)).  Furthermore, in *Williams*, the U.S. District Court for the Eastern District of Virginia, applying *Hatfill*, held that allegations that plaintiff "suffered severe emotional distress, is constantly terrified that she is being watched by people outsider [*sic*] her home, is constantly checking the blinds in her home, and is moving to a new location" were sufficient to state a claim for intentional infliction of emotional distress in federal court; and that defendants "knew or should have known" that recording and disseminating a video of Plaintiff having sexual intercourse would cause emotional disturbance because "the possible emotional impact of discovering that one has been secretly taped having intercourse in a private residence can be considered 'common knowledge.'"  997 F. Supp. 2d at 414-15.

The FAC further alleges that continued interception and the Defendant Lawyers' continued use of Plaintiff's illegally obtained communications in the divorce proceeding -- despite receiving repeated warnings from Brian West and the attorney for Ms. Pawar, as well as Judge Horne's ruling that the recordings were illegal and violated wiretap laws -- caused Plaintiff to feel "increasingly anxious and distressed about his ability to have any private conversations, including but not limited to, private conversations with his attorney in the underlying divorce case, Brian West." FAC, ¶67.  "Plaintiff felt continuously on edge and began to seek out public places like crowded malls and streets for any and all private conversations." *Id.*  Thus, similar to the plaintiff in *Williams*, Plaintiff here has alleged being "constantly terrified" that he is "being watched by people." *Williams*, 997 F.Supp.2d at 415.

Finally, the FAC alleges that "[t]hrough the continuous interception of Plaintiff's communications . . . Defendants became aware of the most salacious and intimate details of Plaintiff's most private conversations and activities," which has caused Plaintiff "to feel severely humiliated, embarrassed and distressed." FAC, ¶¶68, 70.  Plaintiff's distress was compounded by the fact that the Defendant Lawyers ***used and continued to use*** information from the illegally intercepted communications in the divorce proceeding, despite Judge Horne's March 30 ruling that the recordings were illegally obtained in violation of the wiretap statute.  FAC, ¶¶49-50, and Exhibit I.

Like the defendants in *Williams*, the Defendant Lawyers "knew or should have known" that using and disseminating information from the recordings of Plaintiff's conversations relating to his private relationships and sexual relations would cause extreme emotional disturbance to Plaintiff.  *Williams*, 997 F.Supp.2d at 414. Similarly, the surreptitious recordings of Plaintiff's "intimate affair[s] in the sanctuary of [his] private residence" and his car -- and the Defendant

Lawyers' use and disclosure of that information to third parties particularly after repeated warnings from Plaintiff's counsel about the illegality of their actions and after Judge Horne ruled that the wiretap statute had been violated -- "amounts to outrageous conduct that is 'utterly intolerable in a civilized society.'" *Id.*

The Defendant Lawyers' argument that Plaintiff has failed to meet a "very high bar" for pleading a claim for intentional infliction of emotional distress against Defendant Lawyers is plainly wrong, as the allegations in the FAC are sufficient to meet the federal court pleading requirements that plaintiffs need only give defendants "fair notice of . . . the claim . . . and the ground upon which it rests." *Hatfield*, 416 F.3d at 337.

**5.      The FAC Contains Abundant Factual Allegations That The Defendant Lawyers Violated the Wiretapping Statutes By Using Information That They Knew Or Should Have Known Came From Illegal Recordings.**   The Defendant Lawyers do not challenge the sufficiency of the pleadings that they used information that came from illegal recordings.   Rather, they contend only that the FAC contains inadequate allegations that they knew or should have known that the recordings were illegal.  Mem. 10-11.

Specifically, the Defendant Lawyers contend that "Plaintiff has failed to allege facts which, if proven, would show that the Defendant Lawyers were aware of the factual circumstances surrounding the recordings sufficient to make them aware that they were illegally obtained." Mem. 11.   As we have already shown, however, the FAC is replete with factual allegations which, if proven, establish that the Defendant Lawyers both should have known and in fact did know that the information they were using came from illegal recordings.  See pp. 9-21, *supra*.

Finally, any argument by the Defendant Lawyers that evidence of Plaintiff's purported adultery *could have been obtained* in other ways that did not involve the illegal recordings misses the point of this Rule 12(b)(6) motion, and misses the point of Plaintiff's wiretap claims against the Defendant Lawyers.

First, the purpose of a Rule 12(b)(6) motion is solely to test the sufficiency of the pleadings to determine whether Plaintiff's claims have a "plausible" basis; it is not proper to seek to resolve factual disputes, "the merits of a claim, or the applicability of defenses" on a Rule 12(b)(6) motion.  See pp. 6-7; 10-11; 21, *supra*.

Second, regardless of whether evidence of Plaintiff's purported adultery could have been obtained by other, *legal means*, the key allegations are that *illegal means were in fact used*, which consisted of illegal recordings of Plaintiff's private communications with third-parties in violation of state and federal law.  Knowing of those illegal recordings, the Defendant Lawyers then used the information gained from them for tactical and financial advantages in the divorce litigation by, among other things, needlessly including salacious details from private conversations gained from the illegal recordings in questions for the deposition of Ms. Pawar to humiliate and embarrass her and Plaintiff.

The fact that there may have been *legal means* to obtain evidence of Plaintiff's purported adultery, *but instead illegal means were used* by surreptitious recordings that continued for a period of time far beyond the need to establish evidence of adultery, makes the illegality of the interceptions, and subsequent needless use of the salacious details by the Defendant Lawyers for advantage in the divorce litigation, even more egregious.

In sum, the Lawyer Defendants have provided no valid basis for this Court to dismiss the state and federal wiretap claims against them at the pleading stage. Accordingly, the Defendant Lawyers' request to dismiss the federal and state wiretapping claims should be denied.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Defendant Lawyers' Motion to Dismiss/Motion To Strike should be denied in its entirety.

Respectfully submitted,

THE PELS LAW FIRM

Dated:  September 13, 2018

/s/ Jon D. Pels
Jon D. Pels, Esq. (VA Bar No. 39888)
jpels@pelslaw.com
4845 Rugby Avenue, 3rd FL
Bethesda, MD 20814
(301) 986-5570 (T)
(301) 986-5571 (F)
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of September 2018, a true and correct copy of the foregoing was filed with the Clerk of Court via ECF filing which will send a notification of such filing to all counsel of record as follows:

David D. Hudgins
John E. McIntosh, Jr.
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, VA  22314
(703) 739-3300 (telephone)
(703) 739-3700 (facsimile)
dhudgins@hudginslawfirm.com
jmcintosh@hudginslawfirm.com
Counsel for Defendants Gerald Curran, Esq,
Demian J. McGarry, Esq. and Law Office of
Curran, Moher, Weis, P.C.

Bernard J. DiMuro
M. Jarrad Wright
Jayna Genti
DiMuroGinsberg, PC
1101 King Street, Suite 610
Alexandria, VA  22314
(703) 684-4333 (telephone)
(703) 548-3181 (facsimile)
E-mail:  mjwright@dimuro.com
E-mail:  jgenti@dimuro.com
Counsel for Defendants Kristina Hampton,
Derek Hampton and Danielle Richards

_/s/ Jon D. Pels_
Jon D. Pels, Esq. (VA Bar No. 39888)